# MUTUAL CONSENT PROVISIONS IN THE GUAM COMMONWEALTH LEGISLATION

*Sections of the Guam Commonwealth Bill requiring the mutual consent of the Government of the United States and the Government of Guam raise serious constitutional questions and are legally unenforceable.*

July 28, 1994

## MEMORANDUM OPINION FOR THE SPECIAL REPRESENTATIVE FOR GUAM COMMONWEALTH

The Guam Commonwealth Bill, H.R. 1521, 103d Cong., 1st Sess. (1993) contains two sections requiring the mutual consent of the Government of the United States and the Government of Guam. Section 103 provides that the Commonwealth Act could be amended only with mutual consent of the two governments. Section 202 provides that no Federal laws, rules, and regulations passed after the enactment of the Commonwealth Act would apply to Guam without the mutual consent of the two governments. The Representatives of Guam insist that these two sections are crucial for the autonomy and economy of Guam. The former views of this Office on the validity or efficacy of mutual consent requirements included in legislation governing the relationship between the federal government and non-state areas, *i.e.* areas under the sovereignty of the United States that are not States,[1] have not been consistent.[2] We therefore have carefully reexamined this issue. Our conclusion is that these clauses raise serious constitutional issues and are legally unenforceable.[3]

---

[1] Territories that have developed from the stage of a classical territory to that of a Commonwealth with a constitution of their own adoption and an elective governor, resent being called Territories and claim that that legal term and its implications are not applicable to them. We therefore shall refer to all Territories and Commonwealths as non-state areas under the sovereignty of the United States or briefly as non-state areas.

[2] To our knowledge the first consideration of the validity of mutual consent clauses occurred in 1959 in connection with proposals to amend the Puerto Rico Federal Relations Act. At that time the Department took the position that the answer to this question was doubtful but that such clauses should not be opposed on the ground that they go beyond the constitutional power of Congress. In 1963 the Department of Justice opined that such clauses were legally effective because Congress could create vested rights in the status of a territory that could not be revoked unilaterally. The Department adhered to this position in 1973 in connection with then pending Micronesians status negotiations in a memorandum approved by then Assistant Attorney General Rehnquist. On the basis of this advice, a mutual consent clause was inserted in Section 105 of the Covenant with the Northern Mariana Islands. The Department continued to support the validity of mutual consent clauses in connection with the First 1989 Task Force Report on the Guam Commonwealth Bill. The Department revisited this issue in the early 1990's in connection with the Puerto Rico Status Referendum Bill in light of *Bowen v. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 55 (1986), and concluded that there could not be an enforceable vested right in a political status; hence that mutual consent clauses were ineffective because they would not bind a subsequent Congress. We took the same position in the Second Guam Task Force Report issued during the last days of the Bush Administration in January 1993.

[3] Mutual consent clauses are not a novel phenomenon; indeed they antedate the Constitution. Section 14 of the Northwest Ordinance contained six "articles of compact, between the original States and the people and States in the said territory, and [shall] forever remain unalterable, unless by common consent." These articles were incorporated either expressly or by reference into many early territorial organic acts. *Clinton v. Englebrecht*, 80 U.S. (13 Wall.) 434, 442 (1872). The copious litigation under these "unalterable articles" focussed largely on the question whether the territories' obligations under them were superseded by the Constitution, or when the territory

In our view, it is important that the text of the Guam Commonwealth Act not create any illusory expectations that might mislead the electorate of Guam about the consequences of the legislation. We must therefore oppose the inclusion in the Commonwealth Act of any provisions, such as mutual consent clauses, that are legally unenforceable, unless their unenforceability (or precatory nature) is clearly stated in the document itself.

I.

*The Power of Congress to Govern the Non-State*
*Areas under the Sovereignty of the United States*
*is Plenary within Constitutional Limitations*

All territory under the sovereignty of the United States falls into two groups: the States and the areas that are not States. The latter, whether called territories, possessions, or commonwealths, are governed by and under the authority of Congress. As to those areas, Congress exercises the combined powers of the federal and of a state government. These basic considerations were set out in the leading case of *National Bank v. County of Yankton*, 101 U.S. 129, 132-33 (1880). There the Court held:

> It is certainly now too late to doubt the power of Congress to govern the Territories. There have been some differences of opinion as to the particular clause of the Constitution from which the power is derived, but that it exists has always been conceded.[4]

> \* \* \*

> All territory within the jurisdiction of the United States not included in any State must necessarily be governed by or under the authority of Congress. The Territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective States, and Congress may legislate for them as a State does for its municipal organizations. The organic law of a Territory takes the place of a constitution as the fundamental law of the local government. It is obligatory on and binds the territorial authorities; but Congress is supreme, and for the purposes of this department of its governmental authority has all the

---

became a State, as the result of the equal footing doctrine. We have, however, not found any cases dealing with the question whether the Congress had the power to modify any duty imposed on the United States by those articles.

[4] Some derived that power from the authority of the United States to acquire territory, others from the mere fact of sovereignty, others from the Territory Clause of the Constitution of the United States (Art. IV, Sec. 3, Cl. 2) pursuant to which Congress has "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States". *See e.g. American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511, 542 (1828); *Mormon Church v. United States*, 136 U.S. 1, 42-44 (1890); *Downes v. Bidwell*, 182 U.S. 244, 290 (1901).

At present, the Territory Clause of the Constitution is generally considered to be the source of the power of Congress to govern the non-state areas. *Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 673-674 (1945); *Examining Board v. Flores de Otero*, 426 U.S. 572, 586 (1976); *Harris v. Rosario*, 446 U.S. 651 (1980); *see also Wabol v. Villacrusis*, 958 F.2d 1450, 1459 (9th Cir. 1992), *cert. denied* 506 U.S. 1027 (1992). (Footnote supplied.)

powers of the people of the United States, except such as have been expressly or by implication reserved in the prohibitions of the Constitution.

*Yankton* was anticipated in Chief Justice Marshall's seminal opinion in *American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511, 542-43, 546 (1828). The Chief Justice explained:

> In the mean time [*i.e.* the interval between acquisition and statehood], Florida continues to be a territory of the United States; governed by virtue of that clause in the Constitution, which empowers Congress "to make all needful rules and regulations, respecting the territory, or other property belonging to the United States."

> Perhaps the power of governing a territory belonging to the United States, which has not, by becoming a state, acquired the means of self-government, may result necessarily from the facts, that it is not within the jurisdiction of any particular state, and is within the power and jurisdiction of the United States.

> \* \* \*

> In legislating for them [the Territories], Congress exercises the combined powers of the general, and of a state government.

*Id.* at 542-43, 546.

The power of Congress to govern the non-state areas is plenary like every other legislative power of Congress but it is nevertheless subject to the applicable provisions of the Constitution. As Chief Justice Marshall stated in *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 196 (1824), with respect to the Commerce Power:

> This power [the Commerce Power], like all others vested in Congress is complete in itself, may be exercised to its utmost extent, and *acknowledges no limitations, other than are prescribed in the constitution.* (Emphasis added.)

This limitation on the plenary legislative power of Congress is self-evident. It necessarily follows from the supremacy of the Constitution. *See e.g.*, *Hodel v. Virginia Surface Mining and Reclamation Assoc.*, 452 U.S. 264, 276 (1981). That the power of Congress under the Territory Clause is subject to constitutional limitations has been recognized in *County of Yankton*, 101 U.S. at 133; *Downes v. Bidwell*, 182 U.S. 244, 290-91 (1901); *District of Columbia v. Thompson Co.*, 346 U.S. 100, 109 (1953).

Finally, the power of Congress over the non-state areas persists "so long as they remain in a territorial condition." *Shively v. Bowlby*, 152 U.S. 1, 48 (1894). *See also Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 675 (1945) (recognizing that during the intermediary period between the establishment of the Commonwealth of the Philippine Islands and the final withdrawal of United States sovereignty from those islands "Congress retains plenary power over the territorial government").

The plenary Congressional authority over a non-state area thus lasts as long as the area retains that status. It terminates when the area loses that status either by virtue of its admission

as a State, or by the termination of the sovereignty of the United States over the area by the grant of independence, or by its surrender to the sovereignty of another country.

II.

*The Revocable Nature of Congressional Legislation*
*Relating to the Government of Non-State Areas*

While Congress has the power to govern the non-state areas it need not exercise that power itself. Congress can delegate to the inhabitants of non-state areas full powers of self-government and an autonomy similar to that of States and has done so since the beginning of the Republic. Such delegation, however, must be "consistent with the supremacy and supervision of National authority". *Clinton v. Englebrecht*, 80 U.S. (13 Wall.) 434, 441 (1872); *Puerto Rico v. Shell Co.*, 302 U.S. 253, 260, 261-62 (1937). The requirement that the delegation of governmental authority to the non-state areas be subject to federal supremacy and federal supervision means that such delegation is necessarily subject to the right of Congress to revise, alter, or revoke the authority granted. *District of Columbia v. Thompson Co.*, 346 U.S. 100, 106, 109 (1953).[5] *See also United States v. Sharpnack*, 355 U.S. 286, 296 (1958), *Harris v. Boreham*, 233 F.2d 110, 113 (3rd Cir. 1956), *Firemen's Insurance Co. v. Washington*, 483 F.2d 1323, 1327 (D.C. Cir. 1973). The power of Congress to delegate governmental powers to non-state areas thus is contingent on the retention by Congress of its power to revise, alter, and revoke that legislation.[6] Congress therefore cannot subject the amendment or repeal of such legislation to the consent of the non-state area.

This consideration also disposes of the argument that the power of Congress under the Territory Clause to give up its sovereignty over a non-state area includes the power to make a partial disposition of that authority, hence that Congress could give up its power to amend or repeal statutes relating to the governance of non-state areas. But, as shown above, the retention of the power to amend or repeal legislation delegating governmental powers to a non-state area is an integral element of the delegation power. Congress therefore has no authority to enact legislation under the Territory Clause that would limit the unfettered exercise of its power to amend or repeal.

The same result flows from the consideration that all non-state areas are subject to the authority of Congress, which, as shown above, is plenary. This basic rule does not permit the

---

[5] *Thompson* dealt with the District of Columbia's government which is provided for by Art. I, Sec. 8, Cl. 17 of the Constitution, rather than with the non-state areas as to whom the Congressional power is derived from the Territory Clause. The Court, however, held that in this area the rules relating to the Congressional power to govern the District of Columbia and the non-state areas are identical. Indeed, the Court relied on cases dealing with non-state areas, *e.g.*, *Hornbuckle v. Toombs*, 85 U.S. (18 Wall.) 648, 655 (1874), and *Christianson v. King County*, 239 U.S. 365 (1915), where it held that Congress can delegate its legislative authority under Art. I, Sec. 8, Cl. 17 of the Constitution to the District, subject to the power of Congress at any time to revise, alter, or revoke that authority.

[6] Congress has exercised this power with respect to the District of Columbia. The Act of February 21, 1871, 16 Stat. 419, gave the District of Columbia virtual territorial status, with a governor appointed by the President, a legislative assembly that included an elected house of delegates, and a delegate in Congress. The 1871 Act was repealed by the Act of June 20, 1874, 18 Stat. 116, which abrogated among others the provisions for the legislative assembly and a delegate in Congress, and established a government by a Commission appointed by the President.

creation of non-state areas that are only partially subject to Congressional authority. The plenary power of Congress over a non-state area persists as long as the area remains in that condition and terminates only when the area becomes a State or ceases to be under United States sovereignty. There is no intermediary status as far as the Congressional power is concerned.

The two mutual consent clauses contained in the proposed Commonwealth Act therefore are subject to Congressional modification and repeal.

III.

*The Rule that Legislation Delegating Governmental Powers to a
Non-State Area Must be Subject to Amendment and Repeal is but a
Manifestation of the General Rule that one Congress Cannot Bind
a Subsequent Congress, Except where it Creates Vested Rights
Enforceable under the Due Process Clause of the Fifth Amendment*

The rule that Congress cannot surrender its power to amend or repeal legislation relating to the government of non-state areas is but a specific application of the maxim that one Congress cannot bind a subsequent Congress and the case law developed under it.

The rationale underlying that principle is the consideration that if one Congress could prevent the subsequent amendment or repeal of legislation enacted by it, such legislation would be frozen permanently and would acquire virtually constitutional status. Justice Brennan expressed this thought in his dissenting opinion in *United States Trust Co. v. New Jersey*, 431 U.S. 1, 45 (1977), a case involving the Impairment of the Obligation of Contracts Clause of the Constitution (Art. I, Sec 10, Cl. 1):

> One of the fundamental premises of our popular democracy is that each generation of representatives can and will remain responsive to the needs and desires of those whom they represent. Crucial to this end is the assurance that new legislators will not automatically be bound by the policies and undertakings of earlier days . . . . The Framers fully recognized that nothing would so jeopardize the legitimacy of a system of government that relies upon the ebbs and flows of politics to "clean out the rascals" than the possibility that those same rascals might perpetuate their policies simply by locking them into binding contracts.

Nonetheless, the maxim that one Congress cannot bind a future Congress, like every legal rule, has its limits. As early as 1810, Chief Justice Marshall explained in *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810):

> The principle asserted is that one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature.

> The correctness of this principle, so far as respects general legislation, can never be controverted. But, if an act be done under a law, a succeeding legislature cannot undo it. The past cannot be recalled by the most absolute power. Conveyances have been made, those conveyances have vested legal

estates, and if those estates may be seized by the sovereign authority, still, that they originally vested is a fact, and cannot cease to be a fact.

When, then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest [sic] those rights.

The powers of one legislature to repeal or amend the acts of the preceding one are limited in the case of States by the Obligation of Contracts Clause (Art. I, Sec. 10, Cl. 1) of the Constitution and the Due Process Clause of the Fourteenth Amendment, and in the case of Congressional legislation by the Due Process Clause of the Fifth Amendment. This principle was recognized in the *Sinking-Fund Cases*, 98 U.S. 700, 718-19 (1879):

The United States cannot any more than a State interfere with private rights, except for legitimate governmental purposes. They are not included within the constitutional prohibition which prevents States from passing laws impairing the obligation of contracts, but equally with the States *they are prohibited from depriving persons or corporations of property without due process of law*. They cannot legislate back to themselves, without making compensation, the lands they have given this corporation to aid in the construction of its railroad. Neither can they by legislation compel the corporation to discharge its obligations in respect to the subsidy bonds otherwise than according to the terms of the contract already made in that connection. The United States are as much bound by their contracts as are individuals. (emphasis supplied.)

*See also Bowen v. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 54-56 (1986).

IV.

*The Due Process Clause Does Not Preclude Congress from*
*Amending or Repealing the Two Mutual Consent Clauses*

The question therefore is whether the Due Process Clause of the Fifth Amendment precludes a subsequent Congress from repealing legislation for the governance of non-state areas enacted by an earlier Congress under the Territory Clause. This question must be answered in the negative.

The Due Process Clause of the Fifth Amendment provides:

No *person* shall . . . be deprived of life, liberty, or *property* without due process of law. (emphasis supplied.)

This Clause is inapplicable to the repeal or amendment of the two mutual consent clauses here involved for two reasons. First, a non-state area is not a "person" within the meaning of the Fifth Amendment, and, second, such repeal or amendment would not deprive the non-state area of a property right within the meaning of the Fifth Amendment.

A.

*A non-state area is not a person in the meaning of the Due Process Clause of the Fifth Amendment.*

In *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966), the Court held that a State is not a person within the meaning of the Due Process Clause of the Fifth Amendment. *See also Alabama v. EPA*, 871 F.2d 1548, 1554 (11th Cir.), *cert. denied*, 493 U.S. 991 (1989) ("The State of Alabama is not included among the entities protected by the due process clause of the fifth amendment"); *State of Oklahoma v. Federal Energy Regulatory Comm.*, 494 F.Supp. 636, 661 (W.D. Okl. 1980), *aff'd*, 661 F.2d 832 (10th Cir. 1981), *cert. denied*, *sub. nom. Texas v. Federal Energy Regulatory Comm.*, 457 U.S. 1105 (1982).

Similarly it has been held that creatures or instrumentalities of a State, such as cities or water improvement districts, are not persons within the meaning of the Due Process Clause of the Fifth Amendment. *City of Sault Ste. Marie, Mich. v. Andrus*, 532 F. Supp. 157, 167 (D.D.C. 1980); *El Paso, County Water Improvement District v. IBWC/US*, 701 F. Supp. 121, 123-24 (W.D. Tex 1988).

The non-state areas, concededly, are not States or instrumentalities of States, and we have not found any case holding directly that they are not persons within the meaning of the Due Process Clause of the Fifth Amendment. They are, however, governmental bodies, and the rationale of *South Carolina v. Katzenbach*, 383 U.S. at 301, appears to be that such bodies are not protected by the Due Process Clause of the Fifth Amendment. Moreover, it is well established that the political subdivisions of a State are not considered persons protected as against the State by the provisions of the Fourteenth Amendment. *See*, *e.g.*, *Newark v. New Jersey*, 262 U.S. 192, 196 (1923); *Williams v. Mayor of Baltimore*, 289 U.S. 36, 40 (1933); *South Macomb Disposal Authority v. Township of Washington*, 790 F.2d 500, 505, 507 (6th Cir. 1986), and the authorities there cited. The relationship of the non-state areas to the Federal Government has been analogized to that of a city or county to a State. As stated, *supra*, the Court held in *National Bank v. County of Yankton*, 101 U.S. 129, 133 (1880):

> The territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective States . . . .

More recently, the Court explained that a non-state area is entirely the creation of Congress and compared the relationship between the Nation and a non-state area to that between a State and a city. *United States v. Wheeler*, 435 U.S. 313, 321 (1978). It follows that, since States are not persons within the meaning of the Fifth Amendment and since the political subdivisions of States are not persons within the meaning of the Fourteenth Amendment, the non-state areas are not persons within the meaning of the Due Process Clause of the Fifth Amendment.

B.

*Legislation relating to the governance of non-state areas does not create any rights or status protected by the Due Process Clause against repeal or amendment by subsequent legislation.*

As explained earlier, a subsequent Congress cannot amend or repeal earlier legislation if such repeal or amendment would violate the Due Process Clause of the Fifth Amendment, *i.e.*, if such amending or repealing legislation would deprive a person of property without due process of law. It has been shown in the preceding part of this memorandum, that a non-state area is not a person within the meaning of the Due Process Clause. Here it will be shown that mutual

consent provisions in legislation, such as the ones envisaged in the Guam Commonwealth Act, would not create property rights within the meaning of that Clause.

Legislation concerning the governance of a non-state area, whether called organic act, federal relations act, or commonwealth act, that does not contain a mutual consent clause is clearly subject to amendment or repeal by subsequent legislation. A non-state area does not acquire a vested interest in a particular stage of self government that subsequent legislation could not diminish or abrogate. While such legislation has not been frequent, it has occurred in connection with the District of Columbia. *See District of Columbia v. Thompson Co.*, 346 U.S. 100, 104-05 (1953); *supra* n.6. Hence, in the absence of a mutual consent clause, legislation concerning the government of a non-state area is subject to amendment or repeal by subsequent legislation.

This leads to the question whether the addition of a mutual consent clause, *i.e.* of a provision that the legislation shall not be modified or repealed without the consent of the Government of the United States and the Government of the non-state area, has the effect of creating in the non-state areas a specific status amounting to a property right within the meaning of the Due Process Clause. It is our conclusion that this question must be answered in the negative because (1) sovereign governmental powers cannot be contracted away, and (2) because a specific political relationship does not constitute "property" within the meaning of the Fifth Amendment.

1. As a body politic the Government of the United States has the general capacity to enter into contracts. *United States v. Tingey*, 30 U.S. (5 Pet.) 115, 128 (1831). This power, however, is generally limited to those types of contracts in which private persons or corporations can engage. By contrast sovereign "governmental powers cannot be contracted away," *North American Coml. Co. v. United States*, 171 U.S. 110, 137 (1898). More recently the Supreme Court held in connection with legislation arising under the Contract Clause (Art. I, Sec. 10, Cl. 1) of the Constitution that "the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 23 (1977).[7] In a similar context Mr. Justice Holmes stated:

> One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357 (1908).[8]

Agreements or compacts to the effect that the Congress may not amend legislation relating to the government of a non-state area without the consent of the latter, or that federal legislation shall not apply to Guam unless consented to by the Government of Guam would unquestionably purport to surrender essential powers of the federal government. They are

---

[7] Cases arising under the Contract Clause holding that a State cannot contract away a sovereign power are also applicable to the contracts made by the federal government because the Contract Clause imposes more rigorous restrictions on the States than the Fifth Amendment imposes on the federal government. *Pension Benefit Guaranty Corp. v. R.A. Gray Co.*, 467 U.S. 717, 733 (1984); *National Railroad Passenger Corp. v. A.T. & S.F. Ry..*, 470 U.S. 451, 472-73 n.25 (1985). Hence, when state legislation does not violate the Contract Clause, analogous federal legislation is all the more permissible under the Due Process Clause of the Fifth Amendment.

[8] Cited with approval with respect to federal legislation in *Norman v. B. & O.R.*, 294 U.S. 240, 308 (1935).

therefore not binding on the United States and cannot confer a property interest protected by the Fifth Amendment.[9]

More generally, the Supreme Court held in *Bowen v. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41 (1986), that the contractual property rights protected by the Due Process Clause of the Fifth Amendment are the traditional private contractual rights, such as those arising from bonds or insurance contracts, but not arrangements that are part of a regulatory program such as a State's privilege to withdraw its participation in the Social Security system with respect to its employees. Specifically, the Court stated:

> But the "contractual right" at issue in this case bears little, if any, resemblance to rights held to constitute "property" within the meaning of the Fifth Amendment. The termination provision in the Agreement exactly tracked the language of the statute, conferring no right on the State beyond that contained in § 418 itself. The provision constituted neither a debt of the United States, *see Perry v. United States*, *supra*, nor an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium, *see Lynch v. United States*, *supra*. The termination clause was not unique to this Agreement; nor was it a term over which the State had any bargaining power or for which the State provided independent consideration. Rather, the provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare.

*Id.* At 55. Agreements that the Guam Commonwealth Act may not be amended without the consent of the Government of Guam, or that future federal statutes and regulations shall not apply to Guam without the consent of the Government of Guam clearly do not constitute conventional private contracts; they are elements of a regulatory system.

In the past the Department of Justice at times has concluded that a non-State area may have a vested interest in a specific status which would be immune from unilateral Congressional amendment or repeal.[10] We cannot continue to adhere to that position in view of the rulings of the Supreme Court that legislation concerning the governance of a non-state area is necessarily subject to Congressional amendment and repeal; that governmental bodies are not persons within the meaning of the Due Process Clause; that governmental powers cannot be contracted away, and especially the exposition in the recent *Bowen* case that the property rights protected by the

---

[9] Cases such as *Lynch v. United States*, 292 U.S. 571 (1934), and *Perry v. United States*, 294 U.S. 330 (1935), are not contrary to this conclusion. Both cases involved commercial agreements (*Lynch*: insurance; *Perry*: Government bonds) In *Lynch* the Court held that Congress could not amend the contract merely to save money "unless, indeed the action falls within the federal police police power or some other paramount power." 292 U.S. at 579. *Perry* involved bonds issued by the United States under the authority of Art. I, Sec. 8, Cl. 2 of the Constitution, to borrow money on the credit of the United States. The Court held that Congress did not have the power to destroy the credit of the United States or to render it illusory by unilaterally abrogating one of the pivotal terms of the bonds to save money. While the Court held that the United States had broken the agreement, it nevertheless held that plaintiff could not recover because, as the result of regulations validly issued by the United States, he had not suffered any monetary damages.

[10] *Cf.* n.2.

Due Process Clause are those arising from private law or commercial contracts and not those arising from governmental relations.[11]

Sections 103 and 202 therefore do not create vested property rights protected by the Due Process Clause of the Fifth Amendment.[12] Congress thus retains the power to amend the Guam Commonwealth Act unilaterally or to provide that its legislation shall apply to Guam without the consent of the government of the Commonwealth. The inclusion of such provisions, therefore, in the Commonwealth Act would be misleading. Honesty and fair dealing forbid the inclusion of such illusory and deceptive provisions in the Guam Commonwealth Act.[13]

Finally, the Department of Justice has indicated that it would honor past commitments with respect to the mutual consent issue, such as Section 105 of the Covenant with the Northern Mariana Islands, in spite of its reevaluation of this problem. The question whether the 1989 Task Force proposal to amend Section 103 of the Guam Commonwealth Act so as to limit the mutual consent requirement to Sections 101, 103, 201, and 301 constitutes such prior commitment appears to have been rendered moot by the rejection of that proposal by the Guam Commission.

TERESA WYNN ROSEBOROUGH
Deputy Assistant Attorney General
Office of Legal Counsel

---

[11] It is significant that the circumstances in which Congress can effectively agree not to repeal or amend legislation were discussed in the context of *commercial* contracts. *Bowen*, 477 U.S. at 52.

[12] *Bowen*, it is true, dealt with legislation that expressly reserved the right of Congress to amend, while the proposed Guam Commonwealth Act would expressly preclude the right of Congress to amend without the consent of the Government of Guam. The underlying agreements, however, are not of a private contractual nature, and, hence, are not property within the meaning of the Due Process Clause. We cannot perceive how they can be converted into "property" by the addition of a provision that Congress foregoes the right of amendment.

[13] The conclusion that Section 202 of the Guam Commonwealth Act (inapplicability of future federal legislation to Guam without the consent of Guam) would not bind a future Congress obviates the need to examine the constitutionality of Section 202. In *Currin v. Wallace*, 306 U.S. 1, 15-16 (1939), and *United States v. Rock Royal Co-op.* 307 U.S. 533, 577-78 (1939), the Court upheld legislation that made the effectiveness of regulations dependent on the approval of tobacco farmers or milk producers affected by them. The Court held that this approval was a legitimate condition for making the legislation applicable. Similarly, it could be argued that the approval of federal legislation by the Government of Guam is a legitimate condition for making that legislation applicable to Guam. Since, as stated above, a future Congress would not be bound by Section 202, we need not decide the question whether the requirement of approval by the Government of Guam for *every* future federal statute and regulation is excessive and inconsistent with the federal sovereignty over Guam.